# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALDO JOVANI CAMACHO LOPEZ,** | : | **CIVIL ACTION NO. 3:20-CV-563** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CRAIG A. LOWE, Warden of Pike** | : | |
| **County Correctional Facility,** *et al.*, | : | |
| | : | |
| **Respondents** | : | |

## <u>MEMORANDUM</u>

Petitioner Aldo Jovani Camacho Lopez ("Camacho Lopez") is a civil

detainee in the custody of the United States Department of Homeland Security,

Immigration and Customs Enforcement ("ICE"), who brings this habeas action

pursuant to 28 U.S.C. § 2241 seeking emergency relief in the form of a temporary

restraining order. (<u>See</u> <u>generally</u> Docs. 1, 2). He is presently confined at the Pike

County Correctional Facility ("PCCF"). Most unfortunately, Camacho Lopez has

contracted the COVID-19 virus,[1] and he seeks immediate release based upon

allegations of inadequate medical care.

---

[1] The virus that causes COVID-19 is the "severe acute respiratory syndrome coronavirus 2," also known as "SARS-CoV-2" and the "COVID-19 virus." WORLD HEALTH ORGANIZATION, NAMING THE CORONAVIRUS DISEASE (COVID-19) AND THE VIRUS THAT CAUSES IT, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it. We refer to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."

Over the weekend, we tasked the parties to address, on an expedited basis, the threshold question of this court's jurisdiction as well as the extent of Camacho Lopez's symptoms and the nature of his medical treatment.[2] At the conclusion of a telephonic hearing conducted Monday, April 6, 2020, at 2:00 p.m., we denied Camacho Lopez's request for a temporary restraining order and denied his request for immediate release. This memorandum opinion provides the factual and legal bases for the court's decision.

## I.    <u>Factual Background & Procedural History</u>

Camacho Lopez is 31 years old and a citizen of Mexico. (Doc. 2, Ex. A at 1). On May 4, 2012, while in the United States illegally, Camacho Lopez was charged with driving under the influence of alcohol ("DUI") in Taylor, Pennsylvania. (<u>See</u> Doc. 5-1 ¶ 11). Five days later, he was charged with removability by United States Citizenship and Immigration Services based on his presence in the United States without admission or parole. (<u>Id.</u>) Camacho Lopez served a 30-day sentence on the DUI charge and was released from custody. (<u>See</u> <u>id.</u>) He was thereafter arrested by immigration officials in Philadelphia during an enforcement proceeding, taken into custody, and released on bond. (<u>Id.</u>) After an immigration judge ordered Camacho Lopez removed and the Board of Immigration Appeals dismissed his appeal, Camacho Lopez was removed to Mexico on April 18, 2018. (<u>Id.</u> ¶ 12).

---

[2] We commend the diligent efforts of counsel in fully briefing this matter, including acquiring and submitting pertinent evidence, within 48 hours of receipt of the court's scheduling order.

Less than two months later, on June 14, 2018, United States Border Patrol agents encountered Camacho Lopez in Hidalgo, Texas, and arrested him.  (Id. ¶ 13).  Camacho Lopez was again charged with removability, this time as an alien having been previously removed, and he was removed to Mexico the same day.  (Id.)

Camacho Lopez returned to the United States for a third time between June 2018 and December 2019.  On December 12, 2019, he was arrested, also in Taylor, Pennsylvania, for simple assault and harassment.  (Id. ¶ 14).  He was detained at the Lackawanna County Prison, and an immigration detainer was lodged against him.  (Id.)  On December 16, 2019, Camacho Lopez was transferred to ICE custody and once more ordered to be removed.  (Id.)  Camacho Lopez was then indicted in this court for illegal reentry; he pled guilty and was sentenced to time served.  United States v. Camacho-Lopez, No. 3:20-CR-2, Docs. 1, 19, 21 (M.D. Pa.) (Mannion, J.).  After his federal sentencing, Camacho Lopez was returned to ICE custody and scheduled for removal.  (See Doc. 5-1 ¶¶ 14-15).

On March 28, 2020, Camacho Lopez presented with a fever.  (Id. ¶ 13).  Officials promptly invoked procedures designed to identify and treat ICE detainees with COVID-19 symptoms, placing Camacho Lopez in "cohort" status and postponing his removal.  (Id.)  According to Christopher George, Assistant Field Officer Director ("AFOD George") in ICE's Philadelphia Field Office, "cohorting" is an "infection prevention strategy" that involves housing asymptomatic but potentially ill detainees together during a virus's incubation period.  (Id. ¶ 9).  Cohorting lasts for the entire duration of the incubation period—14 days in the case of the COVID-19 virus.  (Id.)  When an individual in a cohort exhibits symptoms,

they are referred to a medical provider for further evaluation. (Id.) AFOD George

further explains that detainees who test positive will remain isolated for treatment

and, in the event of clinical deterioration, will be transferred to a local hospital. (Id.

¶ 8).

PCCF's Health Services Administrator summarizes Camacho Lopez's

symptoms and treatment as follows:

> [O]n March 28, 2020, Camacho Lopez was identified
> as febrile with a temperature of 100.8 during daily
> temperature assessments conducted on the entire prison
> population. He was presenting with no symptoms and was
> not assessed in response to a medical request submission.
> Following the temperature assessment, the on call medical
> provider was contacted who instructed to provide Camacho
> Lopez with a mask and gloves. On March 28, 2020,
> Camacho Lopez and his cellmate were issued a surgical
> mask and gloves. Additionally, Camacho Lopez and his
> cellmate were moved into a quarantine dorm where they
> are assessed by medical staff no less than three times a day.
> During a routine follow-up assessment on March 31, 2020,
> Camacho Lopez reported generalized body aches and
> shortness of breath when lying down at night. During the
> assessment he presented a body temperature of 102.4. The
> medical provider was contacted and ordered a rapid flu test
> and COVID-19 testing if required as well as instructions to
> administer Tylenol 650 twice daily only if his temperature
> reaches 103 or greater. The rapid flu test was negative, so
> the COVID-19 test was administered. On April 2, 2020, the
> COVID-19 test results were positive. He is currently
> prescribed a multivitamin daily and Gatorade three times
> a day. Camacho Lopez is scheduled to see the medical
> provider for follow up on Tuesday, April 7, 2020, however
> status reports are being relayed by medical personnel on a
> routine basis.

(See id.) Medical records from PCCF confirm the Health Services Administrator's

description of Camacho Lopez's symptoms and his course of treatment. (See Hr'g

Ex. A).

Camacho Lopez provided his own account of his symptoms in a declaration dated April 3, 2020, stating: "At present my lungs hurt, I have trouble breathing, I have chest pain, my throat feels swollen, my muscle and bones are achy, and I have very little energy. I [am] having a lot of trouble breathing, it is taking me a lot of effort to breathe." (Doc. 2, Ex. A ¶ 6). He also claimed to have been seen by a nurse only once per day. (Id. ¶ 7). Based on medical records supplied by respondents, it appears this latter assertion concerning once-daily visits pertains to the treatment period predating Camacho Lopez's positive test result. (Compare Hr'g Ex. at 38-44 (pre-result treatment records dated March 29, 2020, through April 2, 2020), with id. at 44-50 (post-result treatment records dated April 2, 2020, through April 5, 2020)).

Late in the afternoon of Friday, April 3, 2020, Camacho Lopez filed a counseled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. We set an expedited briefing schedule and slated the matter for an emergency hearing, which we held on Monday, April 6, 2020.

Counsel updated the court on Camacho Lopez's medical status as follows. On April 4, 2020, at 9:00 a.m., medical staff reported to AFOD George that Camacho Lopez "remain[ed] in an isolation dorm," that he was "presenting no outward symptoms or signs of distress," and that his fever was being monitored closely by medical staff and treated as needed with Tylenol 650. (Doc. 5-1 ¶ 17). This status update also reported that, as of that date, four ICE detainees at PCCF (including Camacho Lopez and his cellmate) and five correctional officers had tested positive for the COVID-19 virus. (Id. ¶ 18(a)).

Things changed on the evening of April 5, 2020, when Camacho Lopez complained to PCCF medical staff of shortness of breath, difficulty breathing, and generally feeling "as though he cannot get enough air." (Hr'g Ex. A at 55). Staff consulted with the on-call medical provider, who directed that Camacho Lopez be taken immediately to the hospital. (Id.) An emergency department report from Wayne Memorial Hospital reflects that Camacho Lopez was seen at 6:17 p.m. (Id.) The report documents a fever of 102 degrees and complaints of increasing shortness of breath. (Id.) The treating physician noted that Camacho Lopez's oxygen level was at 93% on room air and 100% on an oxygen supply and that he did not appear to be in acute respiratory distress. (Id. at 71). A second emergency department report prepared at 10:15 p.m. indicates that Camacho Lopez denied chest pain, that his vital signs were stable, that he was on two liters-per-minute of oxygen via nasal canula, and that a chest x-ray revealed "concern for pneumonia—viral in context." (Id. at 73).

Camacho Lopez was admitted for observation "given concern for potential escalation of symptoms, especially around day 7-8 from symptom onset." (Id.) As of yesterday morning, his condition was stable: a nurse at Wayne Memorial Hospital reported to PCCF medical staff that Camacho Lopez was receiving IV medication, that his temperature was 98.7 degrees, and that the "latest respiratory assessment revealed diminished lung sounds bilaterally in the bases, no [shortness of breath], no cough, and [oxygen levels of] 98% on room air." (Id. at 55).

## II.   **Legal Standard**

Motions for temporary and preliminary injunctive relief are governed by a four-factor test.[3]  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "it can win on the merits."  Id.  This showing must be "significantly better than negligible but not necessarily more likely than not."  Id. The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  Id.  Only if these "gateway factors" are satisfied may the court consider the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.  Id. at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. Id. at 179.

---

[3] Temporary restraining orders and preliminary injunctions are governed by "nearly identical factors," the principal distinctions being in procedure and effect.  Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 236 n.4 (3d Cir. 2011).  Unlike a preliminary injunction, a temporary restraining order can issue without notice to the adverse party and will dissolve on its own, unless extended by the court or with consent of the adverse party under Federal Rule of Civil Procedure 65(b)(2).  Id.

## III. <u>Discussion</u>

Camacho Lopez's claim, as initially styled, was that PCCF staff were either unable or unwilling to treat his COVID-19 symptoms and that his continued confinement in that facility thus violated the Fifth and Eighth Amendments to the United States Constitution. (<u>See</u> Doc. 1 ¶¶ 32-36; Doc. 2 at 6). He contended that this ongoing constitutional deprivation was so significant and presented such a substantial threat to his health and safety as to mandate immediate release from custody under 28 U.S.C. § 2241. (Doc. 2 at 5-7). Given his recent hospitalization, Camacho Lopez's claim has now shifted: he posits that PCCF is unable to provide conditions of confinement suitable for post-hospitalization convalescence.

Respondents asseverate that a conditions-of-confinement claim is not cognizable in habeas corpus and that, even if it is, Camacho Lopez cannot show a likelihood of success on that claim. (Doc. 5 at 12-21). Respondents also dispute Camacho Lopez's allegation that PCCF failed to appropriately treat his COVID-19 symptoms in the first instance and that it is unequipped to treat him during his recovery. (<u>See</u> <u>id.</u> at 22-23). We begin with respondents' threshold claim as to the scope of habeas corpus relief.

### A.    **Scope of Habeas Corpus Relief**

Respondents question our ability to grant the relief requested by Camacho Lopez pursuant to Section 2241. They contend that Camacho Lopez's conditions-of-confinement claim does not sound in habeas corpus but is instead a civil rights claim which must—and in their view, can only—be remedied in a civil action under 42 U.S.C. § 1983. (Doc. 5 at 12-13).

Both Section 1983 and Section 2241 permit prisoners to contest allegedly unconstitutional conduct by state officials, but the statutes differ in "purpose and effect." Leamer v. Fauver, 288 F.3d 532, 540 (3d Cir. 2002). The remedy of habeas corpus "is clearly quite limited." Id. As the Third Circuit Court of Appeals has explained: the "core" purpose of habeas "has traditionally been to 'inquire into the legality of detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful.'" Id. (citation and internal quotation marks omitted). Thus, habeas has been found to be the proper vehicle for challenges to "the fact or length of confinement," Tedford v. Hepting, 990 F.2d 745, 748 (3d Cir. 1993) (quoting Preiser v. Rodriguez, 411 U.S. 475, 494 (1973)), or the "execution" of that confinement, see Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241-42 (3d Cir. 2005) (quoting Coady v. Vaughn, 251 F.3d 480, 485 (3d Cir. 2001)) (citing United States v. Eakman, 378 F.3d 294, 297 (3d Cir. 2004)). The question we must ask is whether the remedy sought "is, in actuality, a habeas remedy." Leamer, 288 F.3d at 540-41. When a petitioner seeks immediate release from custody, the "sole federal remedy" lies in habeas corpus. See Preiser, 411 U.S. at 500.

Camacho Lopez does not ask the court to order PCCF to provide different medical treatment, to adopt better prophylactic measures, or to otherwise alter its procedures. Nor does he, as respondents imply, (see Doc. 5 at 13), seek to impose liability on the government, to recover money damages, or to obtain any other form of legal or equitable relief. Camacho Lopez seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of

confinement that threaten his health and life. This is unequivocally a habeas remedy. See Preiser, 411 U.S. at 500; Leamer, 288 F.3d at 540-41.

Respondents argue that, while the relief requested may sound in habeas, the claim itself does not. (See Doc. 5 at 12-13). According to respondents, a due process challenge to conditions of confinement can never lie in habeas. (See id.) This argument presents a more difficult question which the Supreme Court of the United States has yet to answer. See, e.g., Boumediene v. Bush, 553 U.S. 723, 792 (2008) (declining to "discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979) (deferring "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement"); Preiser, 411 U.S. at 500 (stating "we need not in this case explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983"). The Court's decisions tell us that Section 1983 "must yield" to the federal habeas statute for claims falling within the "core of habeas"—in essence, that Section 1983 is not available for what is fundamentally a habeas claim. Nelson v. Campbell, 541 U.S. 637, 643 (2004) (citing Preiser, 411 U.S. at 489). They do not answer the converse inquiry: whether the habeas remedy is available for what is fundamentally a civil rights claim.

Precedential authority from our court of appeals is also limited. The court has stated, without elaboration, that "a habeas attack on the conditions of confinement" will be cognizable "only in extreme cases." Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978), superseded by statute on other grounds as stated in

Callwood v. Enos, 230 F.3d 627, 633 (3d Cir. 2000). Later, in Woodall v. Federal

Bureau of Prisons, 432 F.3d 235 (3d Cir. 2005), the court allowed a challenge to the

Federal Bureau of Prisons' criteria for making community corrections center

placements to proceed under the habeas statute. The court held that the claim

concerned "execution" of the petitioner's sentence, and it quoted with approval

decisions from several other circuits that defined the term "execution" broadly, to

include such matters as administration of parole, sentence computation, prison

disciplinary proceedings, prison transfers, and even "conditions" generally. See

Woodall, 432 F.3d at 241-44 (collecting cases).

Beyond the Third Circuit, a split has developed as to whether habeas

corpus provides a remedy for a conditions-of-confinement claim that does not

implicate the fact, duration, or execution of the petitioner's confinement. Several

circuits have held that these claims may be raised in a habeas petition. See Aamer

v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Thompson v. Choinski, 525 F.3d 205,

209 (2d Cir. 2008). Others have rejected them. See Nettles v. Grounds, 830 F.3d

922, 927 (9th Cir. 2016) (en banc), cert. denied, 137 S. Ct. 645 (2017) (mem.); Spencer

v. Haynes, 774 F.3d 467, 469-70 (8th Cir. 2014); Robinson v. Sherrod, 631 F.3d 839,

840-41 (7th Cir. 2011). This divide has been borne out in recent weeks, as courts

across the country confront numerous habeas petitions citing the threat posed by

the COVID-19 viral pandemic as a basis for immediate release. Compare Basank

v. Decker, No. 20 Civ. 2518, ___ F. Supp. 3d ___, 2020 WL 1481503, at *4 (S.D.N.Y.

Mar. 26, 2020) (habeas claim cognizable), with Sacal-Micha v. Longoria, No. 1:20-

CV-37, ___ F. Supp. 3d ___, 2020 WL 1518861, at *4 (S.D. Tex. Mar. 27, 2020) (same claim not cognizable).

Having reviewed the relevant case law, we conclude that certain extraordinary conditions of confinement may warrant a habeas remedy. At the outset, we note that neither case invoked by respondents—the Supreme Court's decision in Preiser and the Third Circuit's decision in Leamer—precludes habeas corpus as a means of challenging conditions of confinement. (See Doc. 5 at 12-13). As explained *supra*, these cases foreclose Section 1983 as a method of vindicating constitutional claims that sound in the "core of habeas." See Preiser, 411 U.S. at 500; Leamer, 288 F.3d at 540-41. Neither decision limits the scope of habeas itself. See Woodall, 432 F.3d at 242 n.5 (rejecting, in *dicta*, identical argument as to scope of Preiser and Leamer). Quite the contrary, the Supreme Court in Preiser hinted that "it is arguable that habeas relief will lie" for challenges to prison conditions. See Preiser, 411 U.S. at 499.

It is not clear, however, that either the Supreme Court or the Court of Appeals for the Third Circuit would go so far as to announce that *any* conditions-of-confinement claim warrants habeas relief. While support for that proposition exists beyond this circuit, see Aamer, 742 F.3d at 1038; Thompson, 525 F.3d at 209, and could in theory be extrapolated from *dicta* in some binding precedent, see Preiser, 411 U.S. at 499; Woodall, 432 F.3d at 242 n.5, there is no need for such a sweeping conclusion today. Our court of appeals has signaled that an "extreme" conditions-of-confinement claim can support habeas relief. Ali, 572 F.2d at 975 n.8. And it has said that claims which go to the very "execution" or "carrying out" of a period

of confinement, even if they do not oppugn the validity of that confinement, are properly brought in habeas. See Woodall, 432 F.3d at 236. We read these decisions to authorize a very limited subset of non-"core" conditions-of-confinement habeas claims.

Camacho Lopez's habeas petition falls within this limited subset. The extraordinary conditions of confinement alleged here—where the petitioner has tested positive for and been hospitalized by a potentially deadly pandemic virus and claims that officials cannot properly treat him—constitute the extreme case in which habeas relief might be available. Such conditions, if they are proven to be as Camacho Lopez alleges, would mark a fundamental shift in the nature of Camacho Lopez's confinement. We conclude that, under the unique circumstances of this case, both the claim brought and the remedy sought are cognizable in habeas corpus.

### B.    Request for Temporary Restraining Order

That Camacho Lopez's claim is cognizable in habeas does not equate to automatic release. The parties are at direct odds as to whether Camacho Lopez is likely to succeed on the merits of his conditions-of-confinement claim, whether Camacho Lopez is in fact likely to suffer irreparable harm, and whether the equities support the requested relief. We address each of these elements in turn.

#### 1.    *Likelihood of Success on the Merits*

Camacho Lopez's constitutional claims can be sorted into two categories: a challenge to nonmedical conditions of confinement at PCCF under the Fifth

Amendment, and a challenge to medical treatment (or alleged lack thereof) by PCCF staff under the Eighth Amendment. (Doc. 1 ¶¶ 38-41; Doc. 2 at 5-6).

As to the Fifth Amendment claim, the law in the Third Circuit is clear that a civil immigration detainee is entitled to the "same due process protections" as a pretrial detainee. E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019). An immigration detainee can bring a claim for violation of those protections when the conditions of confinement fall below constitutional minimums. Id. To obtain injunctive relief on this claim, Camacho Lopez must demonstrate that the conditions of confinement at PCCF amount to "punishment" lacking any reasonable relationship to "a legitimate governmental objective." Bell, 411 U.S. at 535, 539.

Camacho Lopez takes issue with PCCF's alleged inability to comply with federal guidance for preventing the spread of the COVID-19 virus within the facility, positing that its failure to do so constitutes impermissible punishment. (See Doc. 1 ¶¶ 39-40). It may be that PCCF is struggling to quickly implement federal hygiene directives and other public-health recommendations in the institutional setting.[4] But we need not address the merits of this particular claim at this juncture. While relevant to a claim for habeas relief by vulnerable detainees who are not yet ill, see Thakker, No. 1:20-CV-480, Doc. 47 at 20-22, or to a later civil action for damages by Camacho Lopez, it is our view that claimed deficiencies in disease *prevention* efforts

---

[4] (Cf. Doc. 5-1 ¶¶ 7-9, 15-19 (outlining ICE's and PCCF's efforts to comply with guidance from the Centers for Disease Control and Prevention).

cannot serve as a basis, in habeas, to release a detainee who has already contracted the disease.  The distinction is an important one, and Camacho Lopez's COVID-19 affliction distinguishes the instant matter from <u>Thakker v. Doll</u>, No. 1:20-CV-480, Doc. 47 (M.D. Pa. Mar. 31, 2020) (Jones, J.), in which this court granted the immediate release of a group of medically vulnerable detainees in ICE custody in hopes of mitigating their risk of contracting the disease.[5]

Our analysis is thus winnowed to Camacho Lopez's Eighth Amendment claim of inadequate medical treatment.  (<u>See</u> Doc. 1 ¶¶ 35-36).  In this respect, the standard of review is well settled: constitutionally deficient medical treatment is actionable if Camacho Lopez can show (1) that he has a serious medical need and (2) that acts or omissions of detaining officials "indicate deliberate indifference to that need."  <u>Natale v. Camden Cty. Corr. Facility</u>, 318 F.3d 575, 582 (3d Cir. 2003) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-04 (1976); <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).  In <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the Supreme Court

---

[5] We pause briefly to emphasize what we believe to be obvious—that this matter is distinguishable from our colleague's decision in <u>Thakker</u> one week ago. The petitioners in <u>Thakker</u> were also ICE detainees, but their respective medical conditions placed them at risk of experiencing serious complications if they contracted the COVID-19 virus.  <u>See</u> <u>Thakker</u>, No. 1:20-CV-480, Doc. 47 at 2-3. Judge Jones granted habeas relief, directing petitioners immediate release based upon: (1) their heightened vulnerability to the virus, and (2) the conditions of confinement in several ICE detention facilities, including PCCF.  <u>See</u> <u>id.</u> at 19-22. <u>But</u> <u>see</u> <u>United States v. Raia</u>, ___ F.3d ___, 2020 WL 1647922 at *2 (3d Cir. 2020) (finding that mere threat of COVID-19 in federal institutions is insufficient justification for convicted inmate's compassionate release claim under the First Step Act).  As we have observed *passim*, Camacho Lopez's claim is fundamentally different: he seeks release based not on an increased risk of contracting the virus, but PCCF's alleged inability to treat him now that he has contracted it.  In sum, this case is about treatment, not prevention.

defined deliberate indifference, in the prisoner context, as existing only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. The standard is lower for detainees, who must show that the detaining official knew or should have known of, and consciously disregarded, the claimed risk. See Woloszyn v. County of Lawrence, 396 F.3d 314, 320-21 (3d Cir. 2005) (citations omitted). Thus, to establish a likelihood of success on his Eighth Amendment claim, Camacho Lopez must show that he has a serious medical need; that respondents know, or should know, of that need; and that they are consciously disregarding it.

There can be no dispute that Camacho Lopez's COVID-19 diagnosis and attendant symptoms are serious. The disease has proven itself to be deadly, and its trajectory is unpredictable, as reflected by the swift vacillation in Camacho Lopez's symptoms: his medical record reveals reports of shortness of breath and chest pain on March 31, followed by a period of days with no significant complaints, a report on April 4 of a cough and "that's it," and then difficulty breathing that led to inpatient hospitalization just 24 hours later. (See Hr'g Ex. A at 55). We have little difficulty finding that Camacho Lopez has a "serious medical need." See Natale, 318 F.3d at 582 (citations omitted).

The only question before us is whether or not respondents were deliberately indifferent to that need. We think not. As to the propriety of medical treatment prior to hospitalization, medical records establish that Camacho Lopez was being

regularly monitored and appropriately treated.  (See Doc. 5-1 ¶¶ 16-17).  He was placed in cohort status immediately upon registering a fever, placed in a medical isolation dorm as soon as he tested positive for the COVID-19 virus, and closely monitored thereafter.  (See id. ¶ 16; see also Hr'g Ex. at 43-50).  His treatment included at least three vital-sign assessments by medical staff daily (in addition to twice-daily, institution-wide temperature checks); medication as needed to control his fever; and a prescription for a multivitamin and Gatorade for nourishment and hydration.  (Doc. 5-1 ¶ 16; see Hr'g Ex. at 28, 34-35, 44-50).  What is more, medical staff took immediate action upon Camacho Lopez's first post-diagnosis report of severe symptoms, having him transported to a local emergency room on Sunday evening.  (See Hr'g Ex. A at 29-30, 53, 55).  We cannot conclude that these facts rise to the level of deliberate indifference.

During oral argument, Camacho Lopez's counsel acknowledged that his client's hospitalization largely moots his claim that release is necessary to secure appropriate medical treatment.  He conceded that his client is now receiving exactly the medical care that his petition and instant motion request.  However, he posited that Camacho Lopez's hospitalization does not necessarily moot his entire petition.  With the court's leave, counsel recast his claim as a challenge concerning post-hospitalization medical care.  Counsel asserted that it would be in his client's "best interests" to recuperate outside of an institutional setting and that he has concerns, based on Camacho Lopez's deterioration while in detention, that PCCF will be unable to properly care for Camacho Lopez while he convalesces.

Camacho Lopez's claim in this regard is entirely speculative. Preliminarily, the exacerbation of symptoms does not, in and of itself, suggest that medical care has been deficient. Record evidence supplied by Camacho Lopez establishes that the potential for rapid deterioration exists even in clinical settings. (See Doc. 2, Ex. E, CENTERS FOR DISEASE CONTROL AND PREVENTION, INTERIM CLINICAL GUIDANCE FOR MANAGEMENT OF PATIENTS WITH CONFIRMED CORONAVIRUS DISEASE (COVID-19), at 2 (revised Mar. 30, 2020)). More importantly, Camacho Lopez has not shown that PCCF would be unequipped to care for him upon his return to custody. During oral argument, Camacho Lopez's counsel could not articulate what recuperative care would be lacking at PCCF and conceded he is unsure "what the proper methods of recovery are." In response to the court's questions as to PCCF's preparedness to receive Camacho Lopez back into custody, respondents' counsel represented on the record that PCCF medical staff will comply fully with Camacho Lopez's hospital discharge instructions, including any isolation directives. We have no reason to doubt that assurance.

We are not unsympathetic to Camacho Lopez's difficult circumstances, and we hope that his recovery is swift. Our review, however, is limited to the narrow legal question before us. And on this record, we find that Camacho Lopez has shown nothing resembling deliberate indifference by PCCF staff.

### 2. *Irreparable Harm*

Camacho Lopez must also show that he is "more likely than not" to suffer irreparable harm if a temporary restraining order is not granted. Reilly, 858 F.3d at 179. Irreparable harm is injury of such an irreversible character that prospective

judgment would be inadequate to make the movant whole.  See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  Mere risk of injury is not enough.  Rather, the moving party must establish that the claimed harm is imminent and probable.  Anderson, 125 F.3d at 164.  The requirements of irreparable harm and likelihood of success on the merits are correlative: that is, the weaker the merits showing, the more will be required on the showing of irreparable harm, and *vice versa*.  See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

To establish irreparable harm, Camacho Lopez points again to his COVID-19 diagnosis, his personal symptoms, and the general—indisputable—fact that, for some, the disease has proven to be deadly.  (See Doc. 2 at 5-6).  Camacho Lopez initially focused this argument on the perceived risks of failing to release him to "seek proper treatment."  (Id.)  That argument has been mooted by our finding that Camacho Lopez received treatment responsive to his initial symptoms and the fact that he is now receiving the exact treatment sought.  Ostensibly, the same residual concern underlying counsel's merits argument—that PCCF might be unable to provide adequate convalescent care—now forms the basis of Camacho Lopez's modified claim of irreparable harm.  This argument, too, lacks merit.

Camacho Lopez received appropriate medical treatment during his initial period of confinement, and there is no indication that this careful monitoring and treatment will cease when Camacho Lopez is returned to that facility.  We are assured that PCCF medical staff will adhere to any hospital discharge instructions

and continue to monitor Camacho Lopez closely.  And Camacho Lopez's counsel has supplied no evidence to support his intimation that his client's prognosis may be better if he were freed to recuperate privately.  Because Camacho Lopez has received proper medical treatment and PCCF is prepared to continue treating him, Camacho Lopez has not shown that he is "more likely than not" to suffer imminent and irreparable harm if he is returned to detention.  <u>See</u> <u>Reilly</u>, 858 F.3d at 179.

### 3.    *Balancing of Equities*

Because the "gateway factors" of likelihood of success on the merits and irreparable harm have not been satisfied, we need not tarry long on the final two factors: the possibility of harm to the nonmovant and the public interest.  <u>Id.</u> at 176, 179.  We nonetheless note that Camacho Lopez is a twice-removed person whose third removal, initially set for March 30 of this year, was delayed solely because of his COVID-19 diagnosis.  (Doc. 5-1 ¶ 16).  Both the respondents and the public have an interest in enforcement of these removal orders, <u>see</u> <u>Nken v. Holder</u>, 556 U.S. 418, 436 (2009), and Camacho Lopez's continued detention furthers that interest. We must also note that, while he is legally detained, Camacho Lopez is isolated from society at large, restricted from spreading this highly contagious virus within the community, and receiving appropriate medical care.  The governmental and public interests thus align to support denial of a temporary restraining order.

## IV.   Conclusion

For these reasons, Camacho Lopez's motion (Doc. 2) for temporary restraining order is denied.  Based on counsel's request during oral argument, we will also dismiss Camacho Lopez's petition (Doc. 1) for writ of habeas corpus and mark this case closed.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    April 7, 2020